**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SHAWN ZYSK,<br>                    **Plaintiff,**<br><br>            v.<br><br>PRIMECARE MEDICAL, INC.,<br>DR. MATTHEW KAVALEK,<br>DR. RYAN GANNON,<br>DR. HANI ZAKI,<br>GABRIELLE MASSIMO, PA-C,<br>HEE-WON JEONG, PSYCH-NP,<br>ANGELA BAKER, PA-C,<br>NICOLE BRIGHTER, RN,<br>                    **Defendants.** | CIVIL ACTION<br><br><br><br><br>NO.  25-5191 |

**MEMORANDUM**

**HODGE, J.**                                                                                    **July 15, 2026**

Before the Court is the Motion to Dismiss the Amended Complaint by Dr. Matthew Kavalek ("Dr. Kavalek"); Dr. Ryan Gannon ("Dr. Gannon"); Dr. Hani Zaki ("Dr. Zaki"); Gabrielle Massimo, PA-C ("Massimo, PA-C"); Hee-Won Jeong, Psych NP ("Jeong, Psych NP"); Angela Baker, PA-C ("Baker, PA-C"); and Nicole Brighter, RN ("Brighter, RN") (collectively, "Individual Medical Defendants"); and PrimeCare Medical, Inc. ("PrimeCare") (collectively, "Defendants") (ECF No. 24 (the "Motion")), and the opposition thereto (ECF No. 27). The Amended Complaint brings the following Counts: failure to protect and denial of medical care in violation of the Eighth Amendment, pursuant to 42 U.S.C. § 1983 against all Defendants (Count I); supervisor liability for the Eighth Amendment violation, pursuant to § 1983, against Defendants Dr. Kavalek and Dr. Gannon (Count II); municipal liability pursuant to § 1983 against PrimeCare (Count III); vicarious liability under Pennsylvania law against PrimeCare (Count IV); and medical

negligence under Pennsylvania Law against the Individual Medical Defendants (Count V). For the following reasons, the Motion is denied.

## I.      BACKGROUND

### A.      Factual Background[1]

#### 1.      Plaintiff's Medical Condition and Initial Treatment at Montgomery County Correctional Facility

On July 27, 2024, Plaintiff Shawn Zysk had surgery at Cooper Hospital in New Jersey to heal a cut on his right big toe. (ECF No. 20 ¶ 13.) During the surgery, the tip of Plaintiff's toe was removed, but the bone was left fully intact. (*Id.*) One month later, on August 26, 2024, Plaintiff was taken into custody at Montgomery County Correctional Facility ("MCCF") for a probation violation. (*Id.* ¶ 14.) During his intake at MCCF, Plaintiff informed the staff about his recent toe surgery. (*Id.* ¶ 15.) Plaintiff needed the stitches in his toe to be properly removed, so the Individual Medical Defendants scheduled Plaintiff's follow-up appointment for the end of August of 2024. (*Id.* ¶ 16.)

However, Plaintiff was never taken to this appointment, causing the stitches and wound in his foot to become infected. (*Id.* ¶ 17.) In September or October 2024, the stitches were removed from Plaintiff's toe at MCCF. (*Id.* ¶¶ 18, 51(F).)[2] Plaintiff later complained to the Individual Medical Defendants that his foot was "sore and swollen" and that he needed medical attention. (*Id.* ¶ 19.) When Plaintiff was seen by the Individual Medical Defendants in the third week of October of 2024, he was told his foot was "fine." (*Id.* ¶ 20.) At some point after this meeting with the Individual Medical Defendants, Plaintiff was moved into housing in "'a boat' in the medical wing of [MCCF]." (*Id.* ¶ 21.)

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.
[2] The Amended Complaint contains conflicting allegations regarding when the stitches were removed from Plaintiff's toe at MCCF.

Due to the untreated infection in Plaintiff's foot, he developed a fever of 103.7 degrees. (*Id.* ¶ 22.) Corrections officers at MCCF asked the Individual Medical Defendants to aid Plaintiff. (*Id.* ¶ 23.) The Individual Medical Defendants gave Plaintiff antibiotics and Tylenol, "fail[ing] to provide Plaintiff with any real help." (*Id.* ¶ 24.) As Plaintiff's sickness worsened, he complained to the Individual Medical Defendants and the corrections officers. (*Id.* ¶ 25.) Plaintiff's condition became "so dire" that he was eventually seen by Defendant Dr. Kavalek. (*Id.* ¶ 26.) Dr. Kavalek ordered Plaintiff be sent immediately to Thomas Jefferson Einstein Hospital in Montgomery County. (*Id.* ¶ 27.)

### 2.    Plaintiff's Hospitalizations and Returns to MCCF

While at the hospital, Plaintiff was given intravenous antibiotics. (*Id.* ¶ 28.) Plaintiff was diagnosed with osteomyelitis (a bone infection) in his foot. (*Id.* ¶ 29.) Plaintiff also had Methicillin-resistant Staphylococcus aureus ("MRSA") in his foot, due to the conditions at MCCF that caused the osteomyelitis. (*Id.* ¶ 30.) Plaintiff's toe was amputated and a piece of bone was removed from his foot. (*Id.* ¶ 31.) A peripherally inserted central catheter ("PICC line") was inserted into Plaintiff's body so long-term intravenous antibiotics could be administered. (*Id.* ¶ 32.) Plaintiff remained in the hospital for two weeks before being sent back to MCCF. (*Id.* ¶ 33.)

When Plaintiff returned to MCCF, his PICC line was still inserted. (*Id.* ¶ 34.) But Plaintiff was never given further antibiotics through his PICC line, nor was his PICC line ever flushed to prevent infection. (*Id.* ¶ 35.) As a result, Plaintiff's PICC line became infected. (*Id.* ¶ 36.) The Individual Medical Defendants directed Plaintiff be sent back to the hospital, where Plaintiff then spent several days. (*Id.* ¶¶ 37–38.) Before returning to MCCF, Plaintiff was given oral antibiotics to keep with him. (*Id.* ¶ 39.)

Upon his return to MCCF, Plaintiff was ordered to give these antibiotics to the Individual Medical Defendants. (*Id.* ¶ 40.) The Individual Medical Defendants thereafter did not give Plaintiff his antibiotics. (*Id.* ¶ 41.) When Plaintiff complained about his medication being withheld, or alternative medication being used, the Individual Medical Defendants made a false notation on Plaintiff's chart that he was refusing medication. (*Id.* ¶ 42). But Plaintiff never refused medication. (*Id.*) As a result of his antibiotics being withheld, in December of 2024, Plaintiff returned to the hospital for a third time. (*Id.* ¶ 43.) When he returned to MCCF, Plaintiff was again not given his antibiotics. (*Id.* ¶ 44.) After remaining for six additional weeks at MCCF, Plaintiff's infection in his foot became worse. (*Id.* ¶ 45.)

Plaintiff was sent back to the hospital again in January of 2025. (*Id.* ¶ 46.) Due to Plaintiff's worsening osteomyelitis and MRSA, a surgeon removed his entire metatarsal bone and trimmed the remaining bone on his foot. (*Id.* ¶ 47.) As a result of this amputation, Plaintiff's second toe has become permanently deformed. (*Id.* ¶ 49.) Plaintiff must now walk with a cane for the rest of his life. (*Id.* ¶ 48.) This has severely limited Plaintiff's ability to perform his job as an electrician. (*Id.* ¶ 50.) As a direct and proximate cause of all Defendants' actions (and inactions), Plaintiff "suffered immense physical injuries, and the delay in care caused him to have an invasive surgical procedure, and eventually an amputation." (*Id.* ¶ 59.)

### 3.    Defendants' Roles in Plaintiff's Care

Montgomery County contracted with Defendant PrimeCare to provide medical care to all prisoners and pretrial detainees housed in MCCF. (*Id.* ¶ 57.) The Individual Medical Defendants were employees of Defendant PrimeCare. (*Id.*) Plaintiff details specific dates between 2024 and 2025 when the Individual Medical Defendants each personally treated him:

- Dr. Kavalek was involved in Plaintiff's treatment on at least ten specific days between October 21, 2024 and February 24, 2025, where he prescribed medication, sent Plaintiff to the emergency room, ordered imaging of his foot, and conducted a "wound care plan";

- Dr. Gannon was involved in Plaintiff's treatment on at least nine specific days between November 5, 2024 and January 21, 2025,[3] where he prescribed wound care management, prescribed medication, and evaluated Plaintiff's foot;

- Dr. Zaki was involved in Plaintiff's "psych follow-up" on October 3, 2024;

- Massimo, PA-C was involved in Plaintiff's treatment on at least twelve specific days between August 26, 2024 and February 11, 2025,[4] in which she performed wound care, examined the toe and foot, and prescribed medication;

- Jeong, Psych NP was involved in Plaintiff's treatment on at least ten specific dates between October 22, 2024 and February 25, 2025, primarily for prescribing medication and speaking with Plaintiff regarding medication;

- Baker, PA-C was involved in Plaintiff's treatment on at least seven specific dates between September 11, 2024 and November 9, 2024, including removal of sutures, wound care, and managing medication;

---

[3] The Amended Complaint lists the last medical interaction with Dr. Gannon as occurring on January 21, 2024. (*Id.* ¶ 51(B).) Due to the chronological listing, and the fact that Plaintiff was not at MCCF until August 2024, the Court believes this to be a scrivener's error, and that it should be listed as January 21, 2025.

[4] As noted *supra* n.3, there are similar scrivener's errors in the dates listed in ¶ 51(D) of the Amended Complaint that fall outside of the time period of the allegations, including August 27, 2014, and January 5, 2024.

- Brighter, RN was involved in Plaintiff's treatment on at least three specific dates between September 11, 2024, and October 25, 2024 including prescribing medication and diagnosing Plaintiff with MRSA and osteomyelitis.[5]

(*Id.* ¶ 51(A)–(G).) Plaintiff was treated on a day-by-day basis without the Individual Medical Defendants providing him with an overall comprehensive plan of care. (*Id.* ¶ 52.) Throughout this day-to-day treatment, Plaintiff's infection was not properly addressed, which led to his eventual amputation. (*Id.* ¶ 53.) Plaintiff alleges that the Individual Medical Defendants' conduct fell below the acceptable professional standard. (*Id.* ¶ 54.)

Defendants Dr. Kavalek and Dr. Gannon, as medical directors, were "the hands-on leaders of the medical program at the MCCF," making decisions about policy and Plaintiff's treatment. (*Id.* ¶ 56.) Defendants Dr. Kavalek and Dr. Gannon failed to maintain a clean environment and establish a treatment program for long-term injuries. (*Id.*) They also "chose the cheapest possible options for treatment of [P]laintiff including but not limited to medications, transfers to outside hospitals, following treatment orders from outside hospitals, and follow-up medications upon return [from] the hospital." (*Id.*)

Defendants PrimeCare, Dr. Kavalek, and Dr. Gannon had a responsibility to ensure that all prisoners and pretrial detainees in their custody received proper medical healthcare. (*Id.* ¶ 58.) These Defendants failed to: (1) create and enforce policies that guaranteed proper care would be provided; (2) ensure medical personnel properly acted upon physical health complaints; (3) cause PrimeCare referrals to be properly sent to outside medical professionals; and (4) provide sufficient medical personnel for treatment needs. (*Id.* ¶¶ 60–63.)

---

[5] The Amended Complaint lists that Brighter, RN "prescribed medication"; however Defendants note that as a nurse, Brighter was not able to prescribe medication. (ECF No. 24-1 at 9.)

### B.        Procedural History

Plaintiff filed his initial complaint on September 10, 2025 against Montgomery County, PrimeCare, and John Doe Corrections Officers, Medical Director, and Medical Provider. (ECF No. 1.) On February 24, 2026, Plaintiff filed an Amended Complaint against Montgomery County, PrimeCare, John Doe Corrections Officers, and the Individual Medical Defendants. (ECF No. 20.) Plaintiff brings claims for: failure to protect and denial of medical care in violation of the Eighth Amendment (Count I); supervisor liability (Count II); municipal liability (Count III); vicarious liability (respondeat superior) under Pennsylvania law (Count IV); and medical negligence under Pennsylvania law (Count V). (ECF No. 20 at 12–19.)

On March 10, 2026, Defendants filed the present Motion. (ECF No. 24.) On March 11, 2026, Plaintiff and Defendants entered a Stipulation dismissing Montgomery County and John Doe Corrections Officers as party-defendants. (ECF No. 25.) The Court approved the Stipulation on March 13, 2026. (ECF No. 26.) Plaintiff filed his opposition to Defendants' Motion on March 23, 2026. (ECF No. 27.)

## II.    LEGAL STANDARD

To survive a motion to dismiss under 12(b)(6), a complaint must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). This requires more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678).

Applying the principles of *Twombly* and *Iqbal*, the Third Circuit has articulated a three-part analysis to determine whether a complaint will survive a 12(b)(6) motion. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). A court is tasked with: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

## III.    DISCUSSION

In their Motion, Defendants argue that Plaintiff fails to state a claim for deliberate indifference to a serious medical condition under the Eighth Amendment, and thus Count I should be dismissed. Specifically, they argue that Plaintiff merely has a difference of opinion as to the treatment rendered, which does not amount to deliberate indifference. Defendants' arguments as to the remaining counts hinge on their argument that Count I fails and thus there is no underlying constitutional harm for supervisory liability (Count II) or *Monell* liability (Count III), and that the state law claims should be dismissed for lack of supplemental jurisdiction (Counts IV and V).

### A.    Deliberate Indifference to a Serious Medical Condition

The Eighth Amendment requires that the government "provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). This obligation extends to physicians employed to provide medical services to state prison inmates. *West v. Atkins*, 487 U.S. 42, 54 (1988). To state a claim for deliberate indifference to a serious medical condition under the Eighth Amendment, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth

8

Amendment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (quoting *Estelle*, 429 U.S. at 106). Specifically, a plaintiff must allege (1) a subjective showing of deliberate indifference by the defendants to his medical needs, and (2) an objective showing that "those needs were serious." *Pearson v. Prison Health Servs.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Plantier*, 182 F.3d at 197). The Third Circuit has found deliberate indifference to be present in a variety of circumstances, including "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Plantier*, 182 F.3d at 197.

Plaintiff has pleaded an objectively serious medical need. Plaintiff was diagnosed with osteomyelitis and MRSA in his foot. (ECF No. 20 ¶¶ 29–30.) These diagnoses required a series of treatments: amputation of Plaintiff's toe and removal of a piece of bone in his foot (*id.* ¶ 31); the insertion of a PICC line for the administration of long-term intravenous antibiotics (*id.* ¶ 32); and a course of oral antibiotics (*id.* ¶ 39). Taken as true, Plaintiff's medical need is serious because it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citations omitted).[6] While Defendants recite this standard (ECF No. 24-1 at 7), they do not articulate why Plaintiff's condition does not qualify.[7] Thus, at this stage, Plaintiff has satisfied the objective prong of the inquiry.

---

[6] The seriousness of a medical need is also assessed "by reference to the effect of denying [a] particular treatment," like when "denial or delay causes . . . a life-long handicap or permanent loss." *Lanzaro*, 834 F.2d at 347. Given the infection caused by withholding treatment (ECF No. 20 ¶ 35–36) and the cane Plaintiff must now walk with for the rest of his life (*id.* ¶ 48), Plaintiff's medical need could also be considered serious under this formulation.

[7] Plaintiff frames the objective seriousness of his medical need as "beyond dispute," describing osteomyelitis and MRSA as "serious conditions that required four separate hospitalizations,

Turning to the subjective prong of the inquiry, Plaintiff has sufficiently pleaded facts showing the Individual Medical Defendants were deliberately indifferent to his serious medical need. Ultimate success on Plaintiff's claim against the Individual Medical Defendants will turn on each of their specific "personal involvement" in withholding care. *See Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) (citations omitted).[8] Plaintiff describes multiple acts and omissions reflecting delayed treatment, a denial of medication, and a disregard for his worsening condition. This includes delayed follow-up care in August 2024 (ECF No. 20 ¶¶ 16–17); an assertion in October 2024 that Plaintiff was "fine" despite his contrary complaints of pain (*id.* ¶¶ 19–20); and a deterioration of Plaintiff's condition that became "so dire" that he had to be sent immediately to a hospital (*id.* ¶¶ 26–27). Plaintiff further contends that antibiotics were never administered through his PICC line and that the line was never flushed, resulting in infection (*id.* ¶¶ 35–36); that his oral antibiotics were confiscated and withheld (*id.* ¶¶ 39–41, 44); and that no comprehensive care plan was implemented (*id.* ¶ 52).

---

surgical toe amputation, and surgical removal of a metatarsal bone, resulting in permanent disability." (ECF No. 27 at 8.) The Individual Medical Defendants have countered this characterization.

[8] While Defendants have not explicitly raised an argument that Plaintiff's Amended Complaint is an impermissible group pleading, *see Corbin v. Bucks Cnty.*, 703 F. Supp. 3d 527, 532–33 (E.D. Pa. 2023), the Court notes that Plaintiff has sufficiently attributed conduct individually. (*See e.g.*, ECF No. 20 ¶¶ 4, 51–52, 54, 64–76.) The Individual Medical Defendants' references to their personal involvement (or the lack thereof) (*see* ECF No. 24-1 at 9) do not show a lack of proper notice, at least not on this record. *See Watson v. Mercer Cnty.*, No. 23-cv-23318, 2026 WL 562790, at *6–9 (D.N.J. Feb. 27, 2026) (collecting cases and recognizing "overlapping allegations do not transform a complaint into an improper group pleading, and, in fact, a plaintiff may permissibly allege that multiple defendants undertook the same action"). Moreover, while Defendants question the inclusion of Dr. Zaki and Jeong, Psych NP as relevant providers for Plaintiff's foot injury, the allegations are sufficient at this stage to support the inference that these providers were aware of Plaintiff's medical needs and were deliberately indifferent to them. Discovery is needed to determine these providers' roles in Plaintiff's medical care.

Taken together, Plaintiff "does not allege a mere isolated episode of inadvertence, but persistent conduct in the face of resultant pain and risk of permanent injury." *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990). And "[f]rom this [conduct,] one reasonably may infer that the doctor is either intentionally inflicting pain on the prisoner[] or is deliberately indifferent to their medical needs." *Id.* (citation omitted). In addition, "a delay in rendering necessary medical care for non-medical reasons can constitute deliberate indifference." *Bramson v. Sulayman*, 251 F. App'x 84, 86 (3d Cir. 2007) (citation omitted). At this stage, Plaintiff has pleaded sufficient facts regarding Defendants' denial and delay of his medical care.

Defendants seek to challenge these allegations by asserting Plaintiff received a "significant amount of treatment," and merely has "a difference of opinion as to the treatment rendered." (ECF No. 24-1 at 8–10.) In a situation "when medical care is provided," it is presumed that the treatment "is proper absent evidence that it violates professional standards of care." *Pearson*, 850 F.3d at 535. Defendants argue that given the amount of treatment Plaintiff received, the multiple medications Plaintiff was prescribed, and the absence of evidence that professional standards were violated, treatment was proper. But even with this presumption, providing "some care" does not end the inquiry. *See Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017) (recognizing "there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements"); *see also Ramos-Vazquez v. PrimeCare Med., Inc.*, No. 09-cv-00364, 2010 WL 3855546, at *7 (E.D. Pa. Sept. 30, 2010) (recognizing that "receiv[ing] some level of medical care" is not enough where the plaintiff also alleges confiscation of medication and repeated refusals of treatment). Plaintiff alleges that the Individual Medical Defendants delayed necessary follow-up care, ignored his worsening pain and infections, and disrupted both forms of his prescribed

11

antibiotics. The Individual Medical Defendants' assertion that Plaintiff received "some care" does not overcome these allegations.[9]

While this Court recognizes the Third Circuit's recent admonition that "[d]eliberate indifference is a stringent standard," *DiFraia v. Ransom*, 171 F.4th 622, 629 (3d Cir. 2026), Plaintiff's claim here "goes beyond mere negligent failure to diagnose and alleges grossly inadequate treatment motivated by non-medical reasons." *Robinson v. Corizon Health, Inc.*, No. 12-cv-1271, 2016 WL 7235314, at *6 (E.D. Pa. Dec. 13, 2016). Plaintiff alleges that all of the Individual Medical Defendants' misconduct "deviated from an acceptable professional standard of medical treatment and wound care management" (ECF No. 20 ¶ 54), and this deviation appears to be "in some extreme way." *DiFraia*, 171 F.4th at 629. As detailed *supra*, the care Plaintiff was denied and delayed from getting is alleged to be "medically necessary." *Id.* at 630. The Court thus denies the motion to dismiss Count I for the Individual Medical Defendants.[10]

### B.    Supervisory and *Monell* Liability

Defendants' arguments in support of dismissing Counts II and III rise and fall with Count I. Their core contention is that because there is "no underlying constitutional harm," supervisor and *Monell* liability cannot attach. (*See* ECF No. 24-1 at 10–12.) While Defendants hint at the absence of the required "policy or custom" for liability, they primarily focus on Plaintiff's inability to prove deliberate indifference as being "fatal" to his secondary claims. (*See id.*) Because the

---

[9] Moreover, Defendants' characterization of the allegations as a difference of opinion is, in effect, disputing Plaintiff's factual characterizations of the care provided. Such a factual dispute is impermissible at this stage. *See Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022) ("Factual claims and assertions raised by a defendant are not part of [the Rule 12(b)(6) inquiry].").

[10] Defendants' arguments regarding Count I focused on the Individual Medical Defendants, and no argument was raised in the Motion regarding the applicability of Count I as to PrimeCare. The Court thus only analyzes Count I as to the Individual Medical Defendants.

Court will not be dismissing Count I, the arguments as to Count II and III necessarily fail, and so the analysis proceeds.

### 1.    Dr. Kavalek and Dr. Gannon

Liability for supervisors under 42 U.S.C. § 1983 can attach if they, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989). The plaintiff must identify a "specific policy or practice that the supervisor failed to employ." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 134 (3d Cir. 2001). The plaintiff must then show that: "(1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." *Id.*

Plaintiff has identified the specific policies and practices employed by Defendants Dr. Kavalek and Dr. Gannon that evince indifference to risk and caused Plaintiff's harm. Plaintiff describes Dr. Kavalek and Dr. Gannon as the "hands-on leaders" of the MCCF medical program, further casting them as being "personally involved in decision making regarding policy and procedures." (ECF No. 20 ¶ 56.) For these "medical directors" and "policy makers" (*id.* ¶ 6), Plaintiff details specific failures: not maintaining a clean environment (*id.* ¶ 56); not establishing a treatment program for long-term injuries (*id.*); and choosing "the cheapest possible options for [outside] treatment" (*id.*). Plaintiff further alleges that Dr. Kavalek and Dr. Gannon failed to: create and enforce policies guaranteeing proper care (*id.* ¶ 60); ensure that medical personnel properly acted upon health complaints (*id.* ¶ 61); cause PrimeCare referrals to be properly sent to outside

medical professionals (*id.* ¶ 62); and provide enough medical personnel to meet treatment needs (*id.* ¶ 63).[11]

Taking these allegations together, Plaintiff sufficiently alleges that Dr. Kavalek and Dr. Gannon maintained deficient policies or practices that created an unreasonable risk. Further, they were aware of, and deliberately indifferent to, this risk through their leadership roles and direct involvement in Plaintiff's care. *See Beers-Capitol*, 256 F.3d at 134 (citation omitted). Plaintiff need not point to an "affirmative policy" at this stage, and only needs evidence of Dr. Kavalek and Dr. Gannon turning "a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights." *Natale*, 318 F.3d at 584. As such, the Court denies the Motion as to Count II.

### 2.    PrimeCare

Under *Monell*, "[w]hen a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)). Liability can extend to private actors like PrimeCare who are acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 54 (1988); *Donnell v. Corr. Health Servs., Inc.*, 405 F. App'x 617, 621 n.5 (3d Cir. 2010).

While PrimeCare contends that "there was a process in place for Plaintiff to receive significant medical care within MCCF" (ECF No. 24-1 at 12), Plaintiff disagrees and counters by reiterating some of the supervisor-liability allegations discussed *supra* specifically against

---

[11] Plaintiff further emphasizes these specific actions. (*See* ECF No. 20 ¶¶ 78–88.)

14

PrimeCare as well.[12] Plaintiff further asserts that PrimeCare did not "adhere to protocol in detecting and safeguarding inmates" (ECF No. 20 ¶ 92), and maintained policies of not properly staffing the facility and not having inmates properly examined (*id.* ¶¶ 93–94). In addition, Plaintiff cites five prior civil rights cases involving PrimeCare's inadequate medical care, characterizing this conduct as a "long and distinguished history of denying inmates medical treatment." (ECF No. 20 ¶ 55); *see Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (permitting the review of "matters of public record" at the motion to dismiss stage). In Plaintiff's view, "[t]his is the paradigmatic *Monell* custom: a pattern of unconstitutional conduct so widespread and persistent that it has the force of official policy." (ECF No. 27 at 13.)

Plaintiff has plausibly identified either actual policies or a well-settled custom of inadequate medical care sufficient to survive dismissal at this stage. *See Wright v. City of Philadelphia*, 229 F. Supp. 3d 322, 336 (E.D. Pa. 2017) (quoting *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009)) (noting a well-settled "course of conduct" can be considered a custom); *see also Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989) ("Custom may be established by proof of knowledge and acquiescence"); *Williams-Bey v. Phila. Hous. Auth.*, No. 18-cv-05096, 2020 WL 868127, at *10–11 (E.D. Pa. Feb. 21, 2020) (finding that a plaintiff's reference to specific policies and customs is enough to survive dismissal of a *Monell* claim at an early stage). Plaintiff asserts that PrimeCare's conduct was "the moving force that caused [his] constitutional and statutory rights to be violated," that they "knew of the dangers posed by [their] policies and customs," and that they were "deliberately indifferent to [his] constitutional rights."

---

[12] This includes PrimeCare's alleged failure to: create and enforce policies guaranteeing proper care (ECF No. 20 ¶ 60); ensure that medical personnel properly acted upon health complaints (*id.* ¶ 61); cause referrals to be properly sent to outside medical professionals (*id.* ¶ 62); and provide enough medical personnel to meet treatment needs (*id.* ¶ 63).

(ECF No. 20 ¶¶ 91, 96, 100); *see Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) ("Once a § 1983 plaintiff identifies a municipal policy or custom, he must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.") (citation modified). The Court therefore denies the Motion as to Count III.

### C.       Supplemental Jurisdiction

Defendants' arguments seeking dismissal of Counts IV and V are tethered to the dismissal of Counts I–III. It is true that if this Court were to dismiss the federal law claims over which it has original jurisdiction, it "must decline to decide the pendent state claims" absent compelling circumstances. *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (citations omitted). But the Court need not invoke its discretionary authority under 28 U.S.C. § 1367(c) to decline supplemental jurisdiction here. Because the Court is denying in part the motion to dismiss Count I, and denying the motion as to Counts II and III, Defendants' arguments against this Court exercising supplemental jurisdiction over Counts IV and V are moot.[13] *See, e.g.*, *Worrell v. Harshe*, No. 16-cv-2398, 2017 WL 1398650, at *3 (D.N.J. Apr. 18, 2017) ("Defendant's argument that this Court should decline to retain jurisdiction over the state law claims is premised on [their] arguments that Plaintiffs' federal claims should be dismissed. . . . [Because] the federal claims are not subject to dismissal at this stage of the case, [] Defendant's supplemental jurisdiction argument is moot."). Accordingly, the Court denies the motion to dismiss Counts IV and V.

### IV.       CONCLUSION

For the foregoing reasons, the Court denies the Motion.

---

[13] Defendants also cite § 1367(c)(4) (ECF No. 24-1 at 13), but they have not identified why this is an "exceptional circumstance" upon which there are "compelling reasons" to decline supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(4).

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

**HODGE, KELLEY B., J.**